IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| ARLENE JOHNSON, | ) Civil Action No. 3:03-3445-MBS-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| DILLARD'S, INC., | ) |
| MIKE HARTLINE; AND | ) |
| CHUCK RHOADS, | ) **REPORT AND RECOMMENDATION** |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, Arlene Johnson ("Johnson") filed this action in the Court of Common Pleas for Richland County, South Carolina on October 1, 2003. Defendants, Dillard's Inc. ("Dillard's"), Mike Hartline ("Hartline"), and Chuck Rhoads ("Rhoads"), removed this action to this court on October 29, 2003. Prior to filing this action, Dillard's filed an action[1] seeking to compel Johnson to arbitrate her claims. This action was stayed (until November 9, 2005) during the pendency of the arbitration action. Johnson filed an amended complaint on May 3, 2006. She alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("§ 1981").[2] In addition, Johnson alleges claims under South Carolina law. On December 22, 2006, the parties filed a stipulation of dismissal with prejudice as to all claims against

---

[1]Civil Action Number 3:03-02522-MBS.

[2]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

Rhoads in his individual capacity and as to the tortious interference claim with contract claim against Hartline in his individual capacity.[3]

On December 27, 2006, Defendants filed a motion for summary judgment. Johnson filed a memorandum in opposition to summary judgment on January 16, 2007. Defendants filed a reply on January 26, 2007.

<u>SUMMARY JUDGMENT STANDARD</u>

When no genuine issue of any material fact exists, summary judgment is appropriate. <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. <u>Id.</u> Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. <u>Ballinger v. North Carolina Agric. Extension Serv.</u>, 815 F.2d 1001, 1005 (4th Cir.), <u>cert. denied</u>, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> <u>fact</u>." <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing

---

[3]In her memorandum in opposition to summary judgment, Johnson states that she voluntarily dismissed Rhoads as a defendant following discovery. Plaintiff's Opp. Mem. at 1. Thus, the remaining claims are only against Dillard's and Hartline.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).

## FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF

1.    Johnson, a black female, began working for Dillard's in March 2000 as Area Sales Manager ("ASM") of the Men's Department of Dillard's Richland Mall store. See Johnson Dep. 35-38.

2.    Prior to working for Dillard's, Johnson was a store manager with Cato Corporation, a woman's department store chain. Johnson Dep. 23-30.

3

3.    At the time Plaintiff accepted employment with Dillard's, the Richland Mall store was not achieving its sales goals.  Johnson was aware of this when she accepted the job.  Johnson Dep. 34-35.

4.    As the Dillard's Richland Mall Men's Department ASM, Johnson was supervised by Store Manager Angela Phillips ("Phillips").  Johnson Dep. 34, 87.

5.    Phillips positively rated Johnson's performance for the period of March 2000 to February 2001, although sales in the Men's Department continued to lag as compared to the prior year and as to the sales plan that had been projected for the Men's Department.  Johnson Dep. 87, 153-155; Hartline Dep., Ex. 2.

6.    In March 2001, Hartline, a white male, replaced Phillips as the Store Manager.  Phillips reported to Walter Grammer ("Grammer"), Dillard's District Manager.  Hartline Dep. 16.

7.    In October 2001, Lara Anderson ("Anderson"), a white female who was ASM of the Ladies' Department, was demoted to an assistant sales manager position because of her department's slow sales.  Johnson Dep. 101-102; Hartline Dep. 112-113 and Ex. 14.

8.    Hartline, in consultation with his supervisor, Grammer, offered Johnson the Ladies' Department ASM position.  Hartline Dep. 60; Grammer Dep. 42-43, 52.

9.    Johnson initially resisted taking the job because she was offended that Hartline and Grammer made the decision without consulting her first, she thought she had made progress in the Men's Department and wanted to continue there so she could try to beat her numbers from the previous year, and she thought the Ladies' Department was in disarray and had problems that she did not want to be a part of cleaning up.  Johnson Dep. 91-92.  Hartline told Johnson that it would be frowned upon and would limit her opportunities if she did not accept the position.  Johnson accepted the position even though she did not want it.  Johnson Dep. 96.

10.    Johnson received an increase in salary of approximately $48 per week.  There was an increase in responsibility in becoming the Ladies' Department ASM.  See Johnson Dep. 97-98.

11.    During June 2002, Grammer learned that some of the stores in his district would undergo a "matrix change," meaning that the number of ASMs in some stores would change.  Dillard's stores are assigned a certain number of ASMs and Assistant ASMs based on sales volume and those staffing numbers are referred to as a "matrix."  Grammer Dep. 56-57.

12.    On June 28, 2002, Hartline informed Johnson that her employment was terminated for poor sales performance.    See Johnson Dep. 146-147, 227.    She was given a written Documentation of Disciplinary Action form which advised that she was being terminated because:

> On 3/18 Arlene was put on a 60 day countdown because of poor sales performance in her area.  Arlene has been allowed more than 60 days and has been counseled concerning her sales performance at least once during this time frame with no significant sales improvement.  Year-to-date Arlene's sales rank last in the division.  Month-to-date for June[,] Arlene's sales rank last in the division.   Because of a pattern of ongoing, poor sales performance[,] Arlene's employment is terminated as of 6/28/02.

Johnson Dep. Ex. 10; Johnson Dep. 149-150.

13.    Hartline and Charles Rhoads ("Rhoads"), the assistant store manager (also known as operations manager), left the store and went to lunch with Hartline's secretary.  Hartline Dep. 143-149; Rhoads Dep. 63.

14.    Johnson went back to her office to call her pastor and to gather her belongings.  She took two trips to her car to empty her office of her personal belongings.  Johnson Dep. 162-163, 168-169, 177.

15.   At some point, Johnson emailed Grammer regarding her termination and asked him to conduct an investigation. Grammer Dep. 101-108 and Ex. 6; Johnson Dep. 179-180, 205-221 and Ex. 12.

16.   Johnson saw her personnel file in the copy room adjacent to her office. She made a copy of her file and placed the file on Hartline's desk. Johnson took the copy of her file to her car and returned to the store. See Johnson Dep. 172-179.

17.   Johnson decided to make some purchases before leaving the store. Johnson Dep. 181-187.

18.   Johnson admits that she told some of the sale associates that she had been terminated and that some of the associates were crying. Johnson Dep. 184-186.

19.   Upon his return from lunch, Hartline noticed that Johnson was still in the store and directed Lori Ryan ("Ryan"), a uniformed member of the Forest Acres Police Department who also worked for Dillard's, to escort Johnson from the store. Hartline Dep. 155-163; Johnson Dep. 188-202.

20.   Johnson asked Ryan if she was going to escort her from the store and Ryan said "yes." Johnson then asked if she was "being trespassed" and Ryan said she was not sure if that was what Hartline meant. Johnson then asked if they could speak with Hartline and the two went upstairs to Hartline's office. Johnson Dep. 190-193.

21.   Johnson asked Hartline why he had called Ryan to escort her from the store. Hartline replied that he did not want Johnson in the store. Johnson admitted that she raised her voice at Hartline during the conversation. Johnson Dep. 193, 196.

22.    Ryan thought that Johnson was "very belligerent" with Hartline. Hartline asked that Johnson be escorted from the premises.  Tumlin[4] Aff., Ex. A (Security Activity Log).

23.    Ryan escorted Johnson to her office to make sure she had not left anything behind and then walked Johnson out of the store.  Ryan walked next to Johnson, side by side but not touching, on their way out of the store.  On the way out of the store, Johnson did not speak to anyone, including Ryan.  Johnson Dep. 197-201; Rhoads Dep. 75.

24.    When Johnson returned home, Grammer called her, in response to her email, and told her that he had no information for her because he was not aware of what was going on, but he would check some things and get back to her.  Grammer never contacted her again, even after Johnson submitted a formal request to Dillard's for an investigation.  Grammer Dep. 100; Johnson Dep. 222-224 and Ex. 13.

25.    On the date of Plaintiff's termination, Hartline submitted an email to Gene Baker concerning Plaintiff's termination.  Hartline submitted an email to Grammer on July 1, 2002, in which he responded to allegations in Johnson's email.  Grammer Dep., Ex. 6; Hartline Dep., Ex. 14.

26.    After Johnson's termination, Dillard's replaced her with Jim Huggins ("Huggins"), a black male who had worked for approximately six years as the Shoe Department ASM.  See Plaintiff's Opp. Mem., Ex. B; Grammer Dep. 100; Hartline Dep. 14, 136.[5]

---

[4]Lori Ryan is now Lori Tumlin.  See Tumlin Aff., Para. 1.

[5]Grammer incorrectly testified that Huggins was the Men's Department ASM.  Grammer Dep. 100.  He noted his error in his deposition sheet dated December 29, 2006 (prior to the filing of Plaintiff's Opposition Memorandum).  Defendants' Reply, Ex. J.

27. Johnson filed a charge of discrimination with the South Carolina Human Affairs Commission ("SCHAC") on August 25, 2002. She claimed that she was discriminated against based on her race. Johnson Dep., Ex. 16.

28. Johnson claims that during the pendency of her charge she discovered that she had been replaced by Huggins, rather than the men's department manager, which she alleges was the natural progression and suspected Huggins had been placed there because he is black.

29. On March 3, 2003, Johnson amended her charge to include a claim for discrimination based on sex.

30. The Dillard's Richland Mall store closed in approximately April 2003. Grammer Dep. 12.

31. Johnson received a right-to-sue notice from the Equal Employment Opportunity Commission ("EEOC") in July 2003. Plaintiff's Amended Complaint at 2.

<u>DISCUSSION</u>

Plaintiff alleges that Dillard's discriminated against her on the basis of her race plus sex in violation of Title VII and § 1981.[6] She also alleges claims under South Carolina law for breach of contract (against Dillard's), defamation (against Dillard's and Hartline), and intentional infliction of emotional distress (against Dillard's and Hartline). Dillard's and Hartline contend that they are entitled to summary judgment because: (1) Johnson fails to establish a claim under Title VII or § 1981; (2) Johnson fails to establish a claim for breach of contract or breach of a covenant of good faith and fair dealing; (3) Johnson fails to establish a claim for defamation; and (4) Johnson fails to establish a claim for intentional infliction of emotional distress (also known as "outrage").

---

[6]The standard for establishing claims of employment discrimination under either Title VII or §1981 is the same. <u>See</u> <u>Gairola v. Commonwealth of Virginia Dep't of General Serv.</u>, 753 F.2d 1281, 1285-86 (4th Cir.1985).

A.     Title VII and § 1981 Claims - Sex Plus Race Claim

Johnson alleges that she has been discriminated against based on her sex plus race in violation of Title VII and § 1981.[7]  Dillard's contends that it is entitled to summary judgment as to Johnson's Title VII and § 1981 claims because: (1) "sex plus race" is not a protected category under either Title VII or § 1981; (2) Johnson failed to exhaust her administrative remedies under Title VII for a "sex plus race" claim; and (3) Dillard's has provided legitimate, nondiscriminatory reasons for terminating Johnson's employment that she cannot prove are pretextual.

(1)     Protected Category

Dillard's contends that sex plus race discrimination is not a separate protected category under Title VII.  Johnson argues that this Court should recognize a Title VII claim for sex plus race discrimination because: (1) in Phillips v. Martin Marietta Corp., 400 U.S. 542 (1971), the Supreme Court held that applying different standards to women with pre-school aged children and men with pre-school aged children constituted sex discrimination in violation of Title VII, even if women without pre-school aged children were not discriminated against; (2) subsequent Circuit Courts of Appeals have relied on Phillips in specifically holding that a minority female plaintiff could state a claim of discrimination under Title VII on the basis of race, in combination with

---

[7]In her amended complaint, Johnson's claims under Title VII and § 1981 appear only to be discrimination on sex plus race and she does not appear to have asserted that she was discriminated against based on only her sex or only her race.  Defendants, in their motion for summary judgment, argue that Johnson has chosen to proceed solely on a sex plus race theory of discrimination. Defendants' Motion for Summary Judgment at 15. In her opposition memorandum, Johnson contends that her "Amended Complaint in this matter does not foreclose her from proving at trial that either her race or sex was a motivating factor under Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), since she has plainly alleged that both her race and sex motivated her termination. (Amended Compl. ¶ 23.)" Plaintiff's Opp. Mem. at 8.

9

gender, even if the employer did not discriminate against white females or minority males;[8] (3) one district court within the Fourth Circuit has recognized the viability of a sex plus race theory alleged by a black female employee;[9] (4) the Fourth Circuit's holding in Lewis v. Bloomsburg Mills, Inc., 773 F.2d 561, 564-566 (4th Cir. 1985) strongly suggests that the Fourth Circuit recognizes a race plus sex category of discrimination;[10] (5) the courts should not recognize a "sex plus" or "race plus" theory based on a combination with any other immutable characteristic, such as "sex plus marital status" or "race plus parenthood of small children," yet reject a "race plus" claim based on its combination with sex; and (6) if a race plus sex theory was not available, an employer would be permitted to specifically target black females, yet defeat discrimination claims by demonstrating that black male employees and white females were treated favorably. Dillard's contends that sex plus race is not a protected category under Title VII because: (1) the Fourth Circuit has neither accepted or rejected sex plus race as a protected category under Title VII; (2) Title VII, by its very language, does not provide protection to combinations of otherwise protected categories, prohibiting employment decisions from being based on an individual's "race, color, religion, sex, **or** national origin..." 42 U.S.C. § 2000(e)-2 (emphasis added); (3) plaintiffs do not need the sex plus race category because it is sufficient to show that the protected trait was a motivating factor and there is no requirement to show that illegal motivation was the sole motivation; and (4) recognizing sex plus race as a protected category would create an inference of illegal discrimination every time an

---

[8]See Jefferies v. Harris County Cmty. Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980); Lam v. Univ. of Haw., 40 F.3d 1551, 1562 (9th Cir. 1994); Hicks v. Gates Rubber Co., 833 F.2d 1406 (10th Cir. 1987).

[9]Jeffers v. Thompson, 264 F.Supp.2d 314, 326 (D.Md. 2003).

[10]In Lewis, the Fourth Circuit found that the district court did not abuse its discretion in declining to redefine a class of black female discriminates to include black male discriminates.

employer terminates and replaces an employee who is not the same sex and race because everyone would be outside the protected class.

The Fourth Circuit has neither accepted nor rejected "sex plus race" claims. As noted above, the Supreme Court previously recognized a "sex plus" claim in <u>Phillips</u>. Although the Eastern District of Missouri rejected a race plus sex claim in <u>Degraffenreid v. General Motors Assembly Div.</u>, 413 F.Supp.142 (E.D. Mo. 1976), <u>rev'd in part</u>, 558 F.2d 480 (8th Cir. 1977), the other cases cited by Dillard's to support its position do not "flatly reject" a sex plus race claim.[11] As noted above, the Fifth, Ninth, and Tenth Circuits have recognized composite claims in <u>Jefferies</u>, <u>Lam</u>, and <u>Hicks</u>.[12] Additionally, the District of Maryland concluded that the court must determine whether an employer discriminates on the basis of a combination of the factors of race and gender, not just whether it discriminated against people of the same race or the same sex. <u>Jeffers</u>, 264 F.Supp. 2d

---

[11]<u>See</u> <u>Sherman v. American Cyanamid, Co.</u>, 188 F.3d 509 (6th Cir. 1999)[Table](declining plaintiff's request to consider her discrimination claim as an "older woman" because no Federal Court of Appeals had recognized such a claim and considering it would fail to change the result as plaintiff was unable to show that the defendant's reason was pretextual); <u>Logan v. Kautex Textron N. Am.</u>, 259 F.3d 635, 638, n. 2 (7th Cir. 2001)("without deciding whether we recognize a "sex plus" theory we refuse to analyze Logan's claim under such a theory because in her complaint she pleaded only discrimination on account of her race."); <u>Lacy v. Ameritech Mobile Communications</u>, 965 F.Supp. 1056, 1071, n. 16 (N.D. Ill. 1997)(Noting that the only case cited by either party (<u>Degraffenreid</u>) indicated that African-American males were not a protected class and stating that "[w]hile the court recognizes that "race-sex" discrimination might be actionable under Title VII, the mere fact that Ameritech Cellular did not promote African-American male CSRs in 1991 and 1992 is not sufficient to show that the company's reason for not promoting Lacy was pretextual.")

[12]In <u>Jefferies</u>, the Fifth Circuit concluded that discrimination against black females could exist even in the absence of discrimination against black men or white women. <u>Jefferies</u>, 615 F.2d at 1032. The Ninth Circuit, in <u>Lam</u>, stated that "when a plaintiff is claiming race and sex bias, it is necessary to determine whether the employer discriminates on the basis of that combination of factors, not just whether it discriminates against people of the same race or of the same sex." <u>Lam</u>, 40 F.3d at 1562. In <u>Hicks</u>, the Tenth Circuit concluded that "a trial court may aggregate evidence of racial hostility with evidence of sexual hostility." <u>Hicks</u>, 833 F.2d at 1416.

at 326-327. Thus, for purposes of this report and recommendation, the undersigned will assume that Johnson may bring a sex plus race claim under Title VII.

Dillard's also contends that sex plus race discrimination is not recognized or actionable under § 1981. The company, citing Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006), contends that Johnson cannot bring a sex plus race claim under § 1981 because § 1981 serves to proscribe only race discrimination in the making or enforcing contracts. Johnson cites no authority to support her contention that she can bring a sex plus race claim under § 1981, but contends that "the improper consideration of her race violated 42 U.S.C. § 1981, regardless of the fact that her sex was also a consideration." Plaintiff's Opp. Mem. at 9.[13]

Johnson has not shown that a sex plus race claim is viable under § 1981. Section 1981 (which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts...as is enjoyed by white citizens....") does not apply to claims of sex/gender discrimination. Runyon v. McCrary, 427 U.S. 160, 167 (1976); Cornell v. General Elec. Plastics, 853 F. Supp. 221 (S.D.W.Va. 1994).

   (2) Exhaustion of Remedies

Dillard's contends that even if the Court recognizes a sex plus race cause of action, Johnson failed to exhaust her administrative remedies. Johnson argues that she exhausted her administrative remedies with regard to her sex plus race discrimination claim because: (1) Defendants make no claim that they were not on notice of Johnson's intent to pursue a race plus theory; (2) her SCHAC intake form referenced sex as a basis for discrimination; (3) she properly and

---

[13]To the extent that Johnson has properly alleged a separate race only claim under either Title VII or § 1981, she fails to establish a prima facie case of discrimination, as she was replaced by Huggins, a black employee.

timely amended her charge to indicate that she had been discriminated against on the basis of her race and sex and that she had been replaced by a black male; (4) her January 9, 2003 letter to SCHAC specifically asserts that she was discriminated against because she is a black female; (5) Plaintiff's counsel clearly outlined Plaintiff's "race plus" theory in a letter to SCHAC; (6) SCHAC's administrative investigation would have encompassed the race/sex combination; (7) Defendants cite no authority for the proposition that a charge alleging a combination of race and sex discrimination cannot form the basis for a "race plus" lawsuit; and (8) Plaintiff's amended charge is at least as specific as her amended complaint and Defendants have not challenged the sufficiency of her amended complaint or suggested that she has not properly pleaded a "race plus" claim in her amended complaint.

In her first Charge, Johnson checked "race" as the cause of discrimination. She wrote:

II. RESPONDENT(S) REASON(S) FOR ADVERSE ACTIONS(S):
Low sales performance.
III. COMPLAINANT'S CONTENTION(S):
I contend the reason given for my discharge to be pretextual. Other white managers were not fired because of their low sales performance.
IV. DISCRIMINATION STATEMENT:
I therefore believe I have been discriminated against because of my Race (Black), in violation of the South Carolina Human Affairs Law, as amended, and Title VII of the United States Civil Rights Act of 1964, as amended.

Johnson Dep., Ex. 16. In a letter to SCHAC (which was not copied to Defendants) dated January 9, 2003, Plaintiff wrote:

I am writing to follow up on my telephone conversation with you the other day. As we discussed, I recently noticed that the box title[d] "Sex" on my charge of discrimination has not been checked. As I noted on the enclosed Initial Inquiry Questionnaire that I filled out with the Human Affairs Commission prior to filing my charge, I feel that both my race and sex were reasons that my supervisor, Mike Hartline, terminated my employment. Therefore, I wish to amend my charge of discrimination to reflect that I was discriminated against because I was an African-American female.

Johnson Dep., Ex. 18.  In a January 23, 2003 letter to SCHAC (which was not copied to Defendants), Plaintiff's counsel wrote, in part:

> As you and Ms. Johnson have discussed recently, Ms. Johnson wishes to amend her Charge of Discrimination to add sex as a basis for her charge, as she had originally noted on the intake form she completed upon filing her original charge.
>
> Ms. Johnson feels that she was terminated not just because she was black, but also because she was female.  Thus, she feels that her termination was based on a combination of these two discriminatory motives, and that her race and sex discrimination claims are not an "either/or" proposition. Numerous courts have recognized that a black female subclass of discrimination victims can pursue a "sex plus race" discrimination claim under Title VII even if the employer has not discriminated against black males or white females.

Plaintiff's Opp. Mem., Ex. D.   In her amended charge, Johnson checked the boxes for race and for sex.  She wrote:

> III.  I contend that the reason given for my discharge to be pretextual.  Other white managers were not fired because of their low sales performance.  Additionally, I was replaced by a male.
>
> IV.  I therefore believe that I was discriminated against because of my race (Black) and my sex (Female) in violation of the South Carolina Human Affairs Law of 1972, as amended, and Title VII of the United States Civil Rights Act of 1964, as amended.

Johnson Dep., Ex. 17.

Before a federal court may assume jurisdiction over a claim under Title VII, "a claimant must exhaust the administrative procedures enumerated in 42 U.S.C. § 2000e-5(b), which include an investigation of the complaint and a determination by the EEOC as to whether 'reasonable' cause exists to believe that the charge of discrimination is true."  Davis v. North Carolina Dep't of Correction, 48 F.3d 134, 137 (4th Cir. 1995).  Generally speaking, this court does not have subject matter jurisdiction under Title VII of claims omitted from the EEOC administrative charge.  Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995).  However, an employee's claims in this court are not strictly limited by the allegations of the EEOC charge, but rather by the scope of the

EEOC investigation which can reasonably be expected to result from the charge of discrimination. King v. Seaboard Coast Line R.R. Co., 538 F.2d 581, 583 (4th Cir. 1976); EEOC v. General Elec. Co., 532 F.2d 359, 362 (4th Cir. 1976). In other words, a claim omitted from the administrative charge can be maintained in a Title VII complaint only where the claim is "reasonably related to the allegations and claims in the administrative charge or, if disclosed, the omitted claim could reasonably be expected to follow from the administrative investigation based on the deficient administrative charge." Nicol v. Imagematrix, Inc., 767 F. Supp. 744, 753 (E.D.Va. 1991). In Nicol, Judge Ellis engaged in a thorough discussion of this issue and concluded that the factual allegations contained in the narrative of the administrative charge must be analyzed to determine whether a claim is within the scope of the administrative charge of discrimination.

Dillard's, citing Miles v. Dell, Inc., 429 F.3d 480 (4th Cir. 2005), contends that Johnson has not exhausted her administrative remedies because the letters she sent to SCHAC were not copied to Dillard's counsel. In Miles, the plaintiff filed a charge with the EEOC in which she alleged that she was discriminated against due to her sex and pregnancy. Five months after she filed her charge, Miles sent a letter to the EEOC that explicitly alleged retaliation. The letter was not served on the defendant. The Fourth Circuit found that Miles had not exhausted her administrative remedies as to a claim of retaliation because she did not check the box marked "retaliation" on her charge, did not include anything in her narrative about retaliation, and did not send a copy of her letter to the defendant. The Court stated "[i]t would be objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges with the EEOC is to put the charged party on notice of the charges against it." Miles, 429 F.3d at 492. Here, although not expressly laid out as a sex plus race claim, Johnson has alleged in her amended charge that she was discriminated against on the

basis of her sex and race.  Counsel for Johnson expressly laid out a sex plus race claim in the January 2003 letter to SCHAC.  Dillard's has not claimed that it was not on notice of Johnson's claim of sex plus race discrimination, only that Johnson did not explicitly state so in her amended charge.  Here, a claim of sex plus race discrimination appears to be reasonably related to the allegations in Johnson's amended charge.

(3)     Framework

Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may establish a Title VII claim by either of two methods of proof: (1) using a "mixed-motive" framework, whereby the plaintiff demonstrates, by way of direct or circumstantial evidence, that discrimination motivated the employer's adverse employment decision; or (2) using the familiar burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), whereby the plaintiff demonstrates, by way of circumstantial evidence, that the employer's proffered reason for the adverse employment action is merely a pretext for racial or gender discrimination.  See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir.2004)(en banc).

A plaintiff proceeding under the McDonnell Douglas framework establishes a prima facie case of discrimination by offering proof that:

(1)     he is a member of a protected class;

(2)     he was qualified for his job and his job performance was satisfactory;

(3)     he was subjected to an adverse employment action; and

(4)     the alleged adverse action occurred under circumstances that raise a
        reasonable inference of unlawful discrimination.

See Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1286 (4th

Cir.1985); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir.), cert. denied, 516 U.S. 870 (1995);

McDonnell Douglas, 411 U.S. at 802.[14]  McDonnell Douglas provides that, once a plaintiff

establishes a prima facie case, the burden shifts to the employer to articulate a legitimate,

non-discriminatory basis for the challenged employment action.  McDonnell Douglas, 411 U.S. at

802.  If the employer provides the required evidence of a non-discriminatory reason for the action,

the plaintiff must then show that the proffered reasons were not the true reasons for the employment

action, but were a pretext for discrimination.  Id. at 804; see also Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 147 (2000).  In Jeffers, the district court noted that the ultimate burden

of persuasion remains always on the plaintiff and that "the more specific the composite class in

which the plaintiff claims membership, the more onerous that ultimate burden becomes." Jeffers,

264 F.Supp. 2d at 326-327.

(4)     Prima Facie Case - Sex Plus Race Claim

Dillard's concedes that, if this Court finds that black females are a separately

protected category under Title VII, Johnson can likely demonstrate the required elements of her

_____

[14]To the extent that this action concerns a reduction in force ("RIF"), a plaintiff may establish a
prima facie case by offering proof that: (1) she was protected under Title VII; (2) she was selected
for discharge; "(3) [s]he was performing at a level substantially equivalent to the lowest level of
those of the group retained; and (4) the process of selection produced a residual work force of
persons in the group containing some unprotected persons who were performing at a lower level
than that at which [s]he was performing." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315 (4th
Cir.1993)(age discrimination); Corti v. Storage Tech. Corp., 304 F.3d 336, 341, n. 6 (4th Cir.
2002)(gender discrimination).

prima facie case.  Thus, for purposes of summary judgment, the undersigned assumes that Johnson has established a prima facie case.

   (5) <u>Legitimate/Non-Discriminatory Reason</u>

    Dillard's has articulated a legitimate, nondiscriminatory reason for its actions, that Johnson's termination was based on a mandatory staff reduction resulting from a "matrix change" that occurred in June 2002.  The company asserts that Dillard's Richland Mall store needed to reduce its ASMs by one, Grammer and Hartline looked at Johnson's rank among the other Ladies' Department ASMs in Grammer's district based on sales numbers for the current fiscal year to date (February 2002 to June 17, 2002) and the current month (June 2002) compared to the prior year's numbers for the same periods.  Grammer and Hartline state that it was typical for Dillard's to look at year-to-date sales compared to the previous year when evaluating sales performance.  Johnson was chosen for termination because her sales figures were last out of twenty-one Ladies' Department ASMs in Grammer's district for both year to date and the current month.

   (6) <u>Pretext</u>

    In the light most favorable to Johnson, she has presented evidence that Dillard's proffered reason for her termination was pretext for discrimination. At the time of her termination, Johnson was given a written Documentation of Disciplinary form that provided she was terminated for "a pattern of ongoing, poor sales performance."  Johnson Dep. Ex. 10. Dillard's, however, now contends that Johnson was terminated due to the matrix in what appears to be a reduction in force.  In his deposition, Grammer conceded (Grammer Dep. 99) that without the matrix, Johnson's sales figures might have been sufficient to keep her employed.  See <u>EEOC v. Sears Roebuck & Co.</u>, 243 F.3d 846, 854 (4th Cir. 2001)(an employer's changing rationale for adverse employment action can be evidence of pretext).

18

Dillard's also now argues that Johnson's prior counselings were not used as a basis to select her for termination (Defendants' Reply at 5-6). The Documentation of Disciplinary form, however, specifically states that Johnson was placed on a 60 day countdown on March 18, 2002, and she had no significant sales improvement after that time. Johnson denies that a countdown warning occurred or that Hartline had a meeting with her about her performance. See Johnson Dep. 123, 126-127, 130-132, 211-212. When Johnson copied her personnel file, there was a notation in it about such a meeting. Johnson, however, denies seeing the notation prior to her copying the file. Johnson Dep. 130. During discovery, Defendants produced another version of the document, to which Hartline added the notation "action witnessed by Charles Boorman, Store OPS Mgr." Johnson Dep. 132-133, Ex. 8; Hartline Dep. 106-107.

Johnson has presented additional evidence of pretext. Health Shealy ("Shealy"), a white male who had sales figures which were marginally worse than Johnson's sales figures from February to May 2002 (see Grammer Dep. 65),[15] was not counseled about his sales figures during February to May 2002 or placed on a "countdown." Although Grammer testified that there was no set path to becoming Ladies' Department ASM, Rhoads stated that the Men's Department ASM was typically promoted to the Ladies' Department ASM position (Rhoads Dep. 57). After Johnson was terminated, however, the Men's Department ASM (Chris Brown, a white male) was not chosen for Ladies' Department ASM.[16] Additionally, although the information provided by Dillard's as to the

---

[15]Hartline states that it was possible that Shealy was not chosen for termination under the matrix because his June 2002 sales figures showed improvement. Hartline Dep. 133, 138; see also Grammer Dep. 65.

[16]Hours after Johnson's termination, Grammer emailed his supervisor in reference to Johnson's email and advised that Johnson could not possibly claim discrimination because she was being replaced by a black male. Hartline Dep., Ex. 15. Rhoads testified that Chris Brown was not
(continued...)

matrix change is incomplete, it appears that only women were chosen for termination or demotion in Grammer's district in the Summer 2002 matrix change.

      B.    <u>State Law Claims</u>

Johnson has also asserted state law claims, as discussed below.

      (1)    <u>Contract Claims</u>

Johnson alleges that Dillard's "Associate Work Rules, General Policies and Benefits" ("Policy Manual") created a contract of employment between Dillard's and its employees. She claims that Dillard's breached the contract by terminating her employment based in whole or in part on her race and sex and by treating her differently than similarly-situated employees. She also claims that Dillard's breached an implied covenant of good faith and fair dealing by terminating her on the basis of her race and sex and treating her differently than similarly-situated employees. Dillard's contends that it is entitled to summary judgment because: (1) Dillard's Policy Manual does not contain mandatory terms which are sufficiently definite or binding on Dillard's to constitute contractual terms; (2) any statements allegedly made to Johnson by Dillard's management are insufficiently definite to constitute an oral contract;[17] and (3) Johnson's allegations that Dillard's breached a contract by discriminating against her based on a combination of her sex and race fails because any mandatory language at issue did not involve contractual promises regarding any equal employment opportunity and there is no evidence that Dillard's discriminated against Johnson due to a combination of her sex and race.

---

[16](...continued)
selected to replace Johnson because he was not "meeting his sales." Rhoads Dep. 58.

[17]Johnson has not addressed this argument in her opposition memorandum and thus appears to have conceded this matter.

Generally, in South Carolina, "an at-will employee may be terminated at any time for any reason or for no reason, with or without cause." Hessenthaler v. Tri-County Sister Help, Inc., 616 S.E.2d 694, 697 (S.C. 2005). However, "when an employer's at-will status has been altered by the terms of an employee handbook, an employee, when fired, may bring a cause of action for wrongful discharge based on breach of contract." Id. at 697. "The typical handbook employment case may be resolved by making three determinations. A handbook forms an employment contract when: (1) the handbook provision(s) and procedure(s) in question apply to the employee, (2) the handbook sets out procedures binding on the employer, and (3) the handbook does not contain a conspicuous and appropriate disclaimer." Grant v. Mount Vernon Mills, Inc., 634 S.E.2d 15, 20 (S.C.Ct.App. 2006).

The parties dispute whether the Policy Manual set out procedures binding on the employer. Johnson claims that the harassment policy contained in the Policy Manual constitutes a contract. This policy defines harassment to include such actions as "[d]iscriminating against any associate in work assignments or job related training" and "[i]nterference with an associate's work." Johnson Dep. Ex. 6, at 5. Johnson also claims that the harassment policy constitutes a contract because it promises discipline by providing that "harassment of any associate...will be considered justification for disciplinary or other appropriate action." Johnson also claims that a section of the Policy Manual titled "Disciplinary Action" contains language that forms a contract because it provides that "[t]he type of discipline issued will vary depending upon the nature of the conduct or violation." Johnson Dep. Ex. 6, at 5.

Johnson fails to show that Dillard's Policy Manual constituted an employment contract. The harassment policy provides steps that an employee is to follow if she is subjected to harassing conduct. Johnson has not claimed sexual or racial harassment in this case. Further, nothing in the harassment policy limits the right of Dillard's to terminate Johnson's employment. The disciplinary

action policy is not binding because it contains permissive language and, contrary to Johnson's assertion, it does not provide specific disciplinary action in specific situations. See Hesenthaler, supra; Storms v. Goodyear Tire & Rubber Co., 775 F. Supp. 862, 867 (D.S.C. 1991) ("Non-mandatory and permissive language is evidence that the employer did not intend to create a binding agreement."); Bagwell v. Fafard, Inc., 2007 WL 2022187 (D.S.C. 2007)("A policy providing that "[e]mployees shall be disciplined or discharged only for just cause ..." does not create a contract."); King v. Marriott Int'l, Inc., 2007 WL 2302421 (D.S.C. 2007)("Marriott's promise that 'there will be no discrimination or recrimination' against an employee who asserts a complaint against the company does not create an expectation that employment is guaranteed or that a particular process must be complied with before an employee is terminated.").[18]  It is, therefore, recommended that summary judgment be granted to Defendants as to Johnson's breach of contract claim.

Johnson also alleges that Dillard's breached an implied covenant of good faith and fair dealing. "Under South Carolina law, there exists in every contract an implied covenant of good faith and fair dealing." Shelton v. Oscar Mayer Foods Corp., 459 S.E.2d 851, 857 (S.C. Ct. App. 1995), aff'd, 481 S.E.2d 706 (S.C. 1997).  The commercial contract covenant of good faith and fair dealing, however, is not implied in employment at-will.  Grooms v. Mobay Chemical Corp., 861 F. Supp. 497 (D.S.C. 1991)(policy manual which was not written in mandatory terms and contained vague

---

[18]Marriott's "Policy on Harassment & Professional Conduct" provided:
> The Company strictly prohibits retaliation against any person by another associate for using this complaint procedure, reporting perceived harassment, or for filing, testifying, assisting or participating in any manner in any investigation, proceeding or hearing.  An associate who brings such a complaint to the attention of the Company in good faith will not be adversely affected as a result of reporting the harassment.

King, 2007 WL 2302421 at *7.

and unspecific language did not constitute an enforceable contract which would limit employer's right to discharge an at-will employee), aff'd, 993 F.2d 1537 (4th Cir. 1993), cert. denied, 510 U.S. 996 (1993); Satterfield v. Lockheed Missiles and Space Co., Inc., 617 F. Supp. 1359 (D.S.C. 1985).

As discussed above, Johnson fails to show that the Policy Manual constitutes a contract between the parties, and thus she cannot show that Dillard's breached an implied covenant of good faith and fair dealing.  See Williams v. Grimes Aerospace Co., 988 F. Supp. 925, 941(D.S.C. 1997)(An "implied covenant can attach only to an existing contract...Therefore this covenant does not apply unless a contract first exists.")(citations omitted).

    (2) Defamation

Johnson alleges that Defendants defamed her by having her removed from the store by a uniformed police officer.  She claims her removal from the store conveyed a defamatory meaning and suggested she was being terminated because of criminal or unlawful conduct and/or that she was engaging in some type of criminal or unlawful activity that made her a threat to the security of the store.  Johnson alleges that the alleged defamatory act was observed by her co-workers and by customers.  Defendants contend that they are entitled to summary judgment as to this claim because: (1) Defendants did not make a defamatory statement, (2) if

Defendants made a defamatory statement it is conditionally privileged;[19] (3) Johnson has not proven special damages, and (4) any statement made by Defendants was truthful.

The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff. Holtzscheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497, 501 (S.C. 1998). Defamatory communications take two forms: libel and slander. Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct. Id. If a communication is libelous, then the law presumes the defendant acted with common law malice. Id. Under South Carolina law, to state a cause of action for defamation, a plaintiff must show the existence of some message that (1) is defamatory, (2) is published with actual or implied malice, (3) is false, (4) is published by the defendant, (5) concerned the plaintiff, and (6) resulted in legally presumed or in special damages.[20]

---

[19]This privilege, recognized by the South Carolina Court of Appeals in Manly v. Manly, 353 S.E.2d 312 (S.C.Ct.App.1987), provides a qualified privilege in the following situation:

> A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty.... The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits. Id. at 315 (quoting Conwell v. Spur Oil Co. of W. South Carolina, 125 S.E.2d 270, 274-75 (S.C.1962)). Here, however, the statement does not appear to have been made "to a person having a corresponding interest or duty."

[20]An allegedly defamatory statement can either be "actionable per se" or "not actionable per se." Holtzcheiter, 506 S.E.2d at 510. A statement that is actionable per se does not require proof of special damages. Id. A statement that is not actionable per se cannot support a defamation claim without evidence of "tangible losses or injury to the plaintiff's property, business, occupation or profession, capable of being assessed monetarily." Id. All libel is actionable per se, but slander is only actionable per se if it relates to one of the following five categories: (1) the commission of a crime of moral turpitude; (2) the contraction of a "loathsome disease"; (3) adultery; (4) lack of

(continued...)

Parker v. Evening Post Pub. Co., 452 S.E.2d 640, 644 (S.C. Ct. App. 1994), cert. denied, 516 U.S. 1172 (1996).

Dillard's contends that having Johnson escorted from the store does not constitute a defamatory statement. Johnson claims that this action was a defamatory statement because the meaning of the action was plain and having her escorted out of the store constituted an assertion as to her character that was both derogatory and false.

Defamation need not be accomplished in a direct manner. Eubanks v. Smith, 354 S.E.2d 898 (1987); Tyler v. Macks Stores, 272 S.E.2d 633 (1980). A mere insinuation is actionable as a positive assertion if it is false and malicious and its meaning is plain. Id.

Here, Johnson has not shown that being escorted out of the store by the off-duty police officer was false and malicious and that its meaning was plain. She admits that she told sales associates, prior to her being escorted out, that she had been terminated on the basis of her sales. Johnson has not presented any evidence that anyone thought she was escorted from the store for engaging in any type of criminal or unlawful activity. The cases where South Carolina courts have found that a case should be submitted to a jury are distinguishable from this action. In Mains v. K Mart Corp., 375 S.E.2d 311 (S.C.Ct.App. 1988), the South Carolina Court of Appeals held that a combination of words and conduct from K mart employees (stopping and questioning a customer about a jacket he was wearing and escorting him to the back of the store) were sufficient to create a question of fact whether a published defamatory statement about a customer accused of shoplifting had established a defamatory statement. Mains, 375 S.E.2d at 314. The Supreme Court of South

---

[20](...continued)
chastity; and (5) "unfitness in one's business or profession." Id. at 501. Whether a statement is actionable per se is a matter of law for the court. Id. at 510.

Carolina, in <u>Tyler</u>, found it was proper to submit to the jury a question of whether a customer had been defamed where he was required to take a polygraph test and immediately thereafter he and the store manager were discharged. <u>Tyler</u>, 272 S.E.2d at 634. This action is also distinguishable from the recent case of <u>Moore v. Rural Health Servs., Inc.</u>, 2007 WL 666796 (D.S.C. February 27, 2007) in which the District Court denied the defendant's motion for summary judgment on the issue of defamation where the plaintiff alleged that a Sheriff's Deputy was called to escort plaintiff out of the building and while the plaintiff was trying to gather his belonging, a member of defendant's board of directors loudly stated in front of defendant's employees and patients that the plaintiff was stealing defendant's items and demanded that the Sheriff's Deputy search plaintiff's car. <u>Id.</u> at *4-5. Other courts have found that where a terminated employee was merely walked off the premises, even by a uniformed officer, the conduct was not defamatory as a matter of law. <u>Bagby v. General Motors Corp.</u>, 976 F.2d 919 (5th Cir. 1992); <u>Davis v. Johns Crane, Inc.</u>, 633 N.E.2d 929, 938 (Ill. App. Ct. 1st Dist. 1994); <u>Dubrovin v. Marshall Field's & Co. Employee's Credit Union</u>, 536 N.E.2d 800 (Ill.

App. Ct. 1st Dist. 1989); <u>Brown v. Gino Morena Enters.</u>, 44 F.Supp.2d 41 (D.D.C. 1999);[21] <u>Gay v. William Hill Manor, Inc.</u>, 536 A.2d 690, 693 (Md.Ct. Spec. App. 1988).

---

[21]In <u>Brown</u>, the court also stated that, in determining whether having an employee escorted off the premises should support a claim for defamation, a court should consider the public policy implications of subjecting an employer to potential liability for taking the precautionary action of calling for an escort to avoid possible disruption by a terminated employee. <u>Brown</u>, 44 F.Supp.2d at 52-53 (citing <u>Tynes v. Shoney's Inc.</u>, 867 F.Supp. 330, 334 n. 4 (D.Md. 1994)("it would be extremely unsound as a matter of public policy to subject the owner of the establishment to civil liability every time the police are called to prevent a conflagration from erupting.")

(3)     <u>Outrage (Intentional Infliction of Emotional Distress)</u>

Johnson claims that by contacting local police and having a uniformed police officer remove her from the store, Defendants performed an act that any reasonable person would find outrageous.  Defendants contend that they are entitled to summary judgment as to this claim because her allegations are already covered by her cause of action for defamation and the conduct alleged does not satisfy an outrage claim.  Johnson claims that her defamation claim does not preclude her claim for intentional infliction of emotional distress at the summary judgment stage.

South Carolina expressly recognized the cause of action of intentional infliction of emotional distress, sometimes referred to as "outrage," in <u>Ford v. Hutson</u>, 276 S.E.2d 776 (S.C. 1981).  To recover under the tort of outrage, a plaintiff must establish the following elements:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct;
>
> (2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community";
>
> (3) the actions of the defendant caused the plaintiff's emotional distress; and
>
> (4) the emotional distressed suffered by the plaintiff was "severe" so that "no reasonable man could be expected to endure it."

<u>Id.</u>, at 778 (quoting <u>Vicnire v. Ford Motor Credit Co.</u>, 401 A.2d 148 (Me. 1979))(internal citations omitted); <u>see</u> <u>also</u> <u>Wright v. Sparrow</u>, 381 S.E.2d 503, 505 (S.C. Ct. App. 1989).  In considering the defendant's motion for summary judgment, the court must initially determine whether the conduct complained of "'may reasonably be regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons may differ is the question one for the jury.'"  <u>Holtzscheiter</u>, 411 S.E.2d 664, 666 (S.C. 1991), overruled on other grounds, 506 S.E.2d 497 (S.C.1998)(quoting <u>Todd</u>

v. South Carolina Farm Bureau Mut. Ins. Co., 321 S.E.2d 602, 609 (S.C. Ct. App. 1984), quashed

on other grounds, 336 S.E.2d 472 (S.C. 1985)); see also Barber v. Whirlpool Corp., 34 F.3d 1268,

1276 (4th Cir. 1994) ("It is the court's responsibility to first determine as a matter of law whether

or not the conduct was outrageous before submitting that question to the jury.").

Johnson has not shown that Defendants' conduct was sufficiently outrageous or intolerable

so as to support a reasonable finding of outrage or intentional infliction of emotional distress.  See,

e.g., Hainer v. American Medical Int'l, Inc., 492 S.E.2d 103, 109 (S.C. 1997)(Supreme Court

affirmed trial court's directed verdict against plaintiff on her outrage claim, holding that her

allegation that a hospital wrongfully reported her misconduct to a state disciplinary agency, even

if the report was filed in bad faith and with malice, did not rise to the level of outrage); Barber,

supra, (no outrageous conduct where employee, who was accused of theft and later terminated, was

subjected to forty-minute meeting where his supervisor was verbally abusive, causing him to cry and

to spend the entire weekend after the incident in bedroom and to contemplate suicide); Gattison v.

South Carolina State Coll., 456 S.E.2d 414 (S.C. Ct. App. 1995)(mere "unprofessional and

inappropriate" conduct did not exceed all possible bounds of decency); Corder v. Champion Road

Machinery Int'l Corp., 324 S.E.2d 79 (S.C. Ct. App. 1984)(mere retaliatory discharge for filing

worker's compensation claim, absent claims of verbal assaults or hostile, abusive encounters, did not

rise to level required for tort of outrage), cert. denied, 332 S.E.2d 533 (S.C. 1985); Brown v.

Pearson, 483 S.E.2d 477, 485 (S.C.Ct. App. 1977)(plaintiffs' allegations, that a church covered up

allegations of sexual abuse, did not establish a jury question).  Further, Johnson has not presented

any evidence of emotional distress so severe that no person could be expected to endure it.

<u>CONCLUSION</u>

Based on the foregoing, it is recommended that Defendants' motion for summary judgment (Doc. 34) be denied in part, as to Plaintiff's claim that she was discriminated against under Title VII based on her sex plus her race, and granted in part as to all other claims.

Respectfully submitted,

s/Joseph R. McCrory
United States Magistrate Judge

August 30, 2007
Columbia, South Carolina